THE HALE ELEVATOR COMPANY

*v.*

GEORGE W. HALE, EXR.

201    131
107a ⁵424

*Opinion filed February 18, 1903.*

1. CONTRACTS—*contract construed as to provision for services of party selling business.* A contract by which the seller of an elevator manufacturing business agrees to assist the purchasing company in such manner as he may be able "without being actually engaged in the business," does not prevent his contracting with the general manager of the company for compensation for securing contracts for elevators and supervising their installment, even though the general manager did not know of the former contract.

2. SAME—*fraudulent representations as a defense to contract.* Fraudulent representations, to be a defense to a contract, must relate to facts material to the question involved, and must be relied upon by the party to whom they were made and who was expected to rely thereon.

3. PRINCIPAL AND AGENT—*when principal is estopped to object to an agent's contract.* A principal who, with full knowledge of the terms of a contract and the benefits which his agent is to receive thereunder, accepts and performs the contract, is estopped to raise any objection which he might have made without such knowledge.

4. SAME—*effect of an agent's misrepresentation after contract is made.* Fraudulent representations by an agent, by which the benefit he is to receive under a contract already executed is enhanced, do not vitiate the entire contract, but the rights of the parties will be determined by the contract as it stood before it was changed as the result of such representations.

5. EVIDENCE—*jury are the judges of the weight of testimony.* The jury are the judges of the credibility of witnesses and the weight of the testimony, and may consider to what extent witnesses are corroborated or contradicted by other testimony or by facts and circumstances proven, and may also judge of the probability or improbability of the testimony.

*Hale Elevator Co.* v. *Hale*, 98 Ill. App. 430, affirmed

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. CHARLES G. NEELY, Judge, presiding.

For a number of years prior to May 1, 1888, William E. Hale and his brother, George W. Hale, were engaged in the elevator business under the firm name of W. E. Hale & Co., in the city of Chicago. The Crane Elevator Company had long been their business rival, and on the day mentioned there was an agreement reached by the Crane Company to buy out the Hales, and an agreement was drawn up between the Hales on one side and the Crane Elevator Company and R. T. and C. R. Crane on the other. One of the provisions of the contract was that the Hale Elevator Company, a corporation, should be organized, and the good will, etc., of the old firm of W. E. Hale & Co. turned over to this new corporation, and on December 24, 1888, there was a contract entered into between the Hale Elevator Company and William E. and George W. Hale for the transfer of all their business and assets to the Hale Elevator Company. Among other provisions the contract contained the following: "In consideration of one dollar to them in hand paid, and the promises and agreements herein contained, the said parties of the second part hereby covenant and agree to give so much of their time, for the period of ten years, from July 1, 1888, as they shall give to the elevator business in the territory reserved to them in said agreement of May 1, 1878, exclusively to the Hale Elevator Company, and to aid and assist said company in such manner as they may be able, when in Chicago, without being actually engaged in the business, and to advise and consult with its officers, and to transfer to it, with the business, whatever influence and assistance they may be able, to enable it to realize the full benefit and enjoyment of the business heretofore conducted by them under the firm name of W. E. Hale & Co."

On October 19, 1893, Charles N. Coen, who was the general manager of appellant, was desirous of obtaining for his company the contract to place elevators in the Marquette and Champlain buildings, in the city of Chi-

cago, and on that day he asked Mr. W. E. Hale if he "would take hold of the selling of these jobs for the Hale Elevator Company," and he suggested to Hale that he would pay the usual five per cent commission if the sale was made. Hale declined the offer, and said: "You make me a fixed price on these jobs, and anything I get over that will be my own." Thereafter Coen submitted to Hale a proposition in writing, as follows:

"*W. E. Hale, Esq.*, *City:*        "CHICAGO, *Oct. 19, 1893.*

"DEAR SIR—We hereby agree to execute the contract for which we have submitted proposals, or any of them, for the Marquette building and the New York Life Insurance Company building, according to specifications submitted, for the net sum to us, as follows: Marquette building, $60,000; Champlain building, $25,000; New York Life Insurance building, $31,500,—less five per cent (5%) commission. We will purchase of the Vertical Transit Company the eight elevators now in operation in the Transportation building, except enclosures and cars, as follows: We will take possession of the plant November 1, and pay approximately one-half amount due within ten days thereafter and the balance January 1, 1893. The elevator machinery to be taken at cost,—*i. e.*, Otis Bros. & Co.'s bills and freight; the tanks to be taken at cost and freight; all pipe and fittings at Crane's billed price; ropes at cost; all other material at value; we to take it all where it stands, and remove it when required by exposition authorities. We will pay to you the difference between the prices you obtain from owners and above named prices, according as we receive payment on each and every job, viz.: One-half amount due when first payment is received by us, one-half the balance when second payment is made, and balance when contract is completed and accepted. Above prices are figured on Otis Bros. & Co.'s usual charges to us. We will, in addition, pay you any amount you save us on these bills for any machinery in addition to that now at Transportation building.        "Respectfully yours,

HALE ELEVATOR COMPANY,
Per CHA. N. COEN, *Gen'l Manager.*"

On October 23, 1893, the appellant wrote W. E. Hale, through its general manager, Coen: "Mr. Crane has instructed me to say that the Hale Elevator Company must

not take the contract for elevators in the New York Life building," whereupon, it seems, no efforts were made by Hale to secure such contract, and whatever were the rights, if any, of the parties thereto, were not presented for determination in this suit.    Afterwards, on November 25, 1893, the appellant, through its manager, Coen, proposed to construct the Champlain building elevators for $23,000, and wrote on the face of the above instrument the following: "Nov. 25/93;—23,000.00.—Chas. N. Coen."    And on December 30, 1893, the price on the elevators in the Marquette building was reduced to $55,000, and on the face of the above instrument was written the following: "We make price $55,000, according to specifications signed this day.—30/12/93.—C. N. Coen."

On November 25 appellant prepared and forwarded to the Fuller Company, the constructor of the buildings, specifications for the work.    In both specifications and the letter forwarding the same it was stated, "all work to be done under supervision and to the approval of W. E. Hale," and on the same day appellee delivered to manager Coen a contract, duly executed by the Fuller Company, for the construction of the elevators in the Champlain building at $27,300, which was accepted and signed by appellant, through Coen.    On the same day the Hale Elevator Company, by Charles N. Coen, sent W. E. Hale a letter, the only part of which as material in this case is as follows: "In consideration of your efforts to secure contracts for us for the Champlain and the Marquette buildings we hereby agree as follows, to-wit:    We will execute said contracts, when secured by you, at the prices and upon the terms set forth in our letter to you dated October 19, 1893, such prices to be hereafter modified as we may mutually agree, but otherwise to remain as stated in said letter."    On that day Mr. Hale also handed to Manager Coen a letter addressed to the Hale Elevator Company, accepting the provisions of the Hale Elevator Company's letter.    The proposition

from appellant to the Fuller Company, relative to the construction of the elevators in the Marquette building, was in writing, in which appellant proposed to furnish the elevators for $70,000, and the concluding sentence of the proposition is as follows: "So much of Otis vertical cylinder elevators used in Transportation building, at World's Fair, as are available, to be used in this plant; any additional machinery to be made by Otis Bros. & Co. of the same pattern and design as that used at Transportation building, and entire plant to be put up under superintendence and to acceptance of W. E. Hale." Signed, "Hale Elevator Co., per C. N. Coen." The acceptance of the Fuller Company was written at the foot of the proposition. This acceptance was procured by W. E. Hale, and was on the 30th of December, 1893, delivered to Coen, manager of the Hale Elevator Company.

Prior to the making of the above contract, the Hales, with the permission of the appellant, had organized the Vertical Transit Company, for the purpose of equipping with elevators certain buildings at the Chicago World's Fair. The machinery from the Transportation building, above referred to, was owned by the Hales, and the fair having closed, they were desirous of selling the same, and as a part of the contract made at the time Hale's services were engaged, the appellant agreed to purchase these elevators, and did purchase and pay for them, and used such as were suitable in the Marquette building, as shown by the above proposition to the Fuller Company relative to that building.

Appellant refusing to pay for services rendered in procuring the contract for the construction of the elevators, suit was brought by Hale upon the agreements, and modifications thereof, of the Hale Elevator Company, made by Coen, to recover for his services the difference between $27,300 and $23,000 for obtaining the contract for the Champlain elevator, and the difference between $70,000 and $55,000 for obtaining the contract for the in-

installation of the elevators in the Marquette building. Before the trial Hale died, and his executor was substituted as party plaintiff. At the close of all the evidence appellant requested the court to instruct the jury to find the issues for the defendant, which was refused by the court. Upon the trial in the circuit court the jury returned a verdict in favor of the appellee for $16,550, and judgment was entered thereon. Upon appeal to the Appellate Court the judgment of the trial court was affirmed. The present appeal is prosecuted from such judgment of the Appellate Court.

WING & CHADBOURNE, for appellant.

WILSON, MOORE & MCILVAINE, for appellee.

Mr. JUSTICE RICKS delivered the opinion of the court:

At the close of all the evidence the appellant offered an instruction directing the jury to find a verdict in its favor, which the court refused, and upon this error is assigned, and it is insisted that the instruction should have been given for the following reasons:

*First*—"The contract in suit was in fraud of the contract of 1888; that William E. Hale had previously been fully paid for the very services which the present suit respects; the contract in suit was void because manager Coen had no authority to make it." Under this head it is urged that the contract of 1888 was intended to, and does by its terms, cover the services rendered under the contract sued on, and that William E. Hale fraudulently obtained the contract sued on, knowing that the former contract was in existence; that Coen, the general manager of appellant, did not know of its existence; that the two contracts were the same in meaning, demanded the same services, and that therefore Hale was not entitled to compensation other than the one dollar mentioned in the contract of 1888, and that Coen had no authority to

make the contract sued on because of the existence of the contract of 1888, under seal, which could not be changed or revoked by Coen, as such power would not be implied from his position as general manager.

With the contention that the services claimed for under the contract sued on were covered by the contract of 1888 we cannot agree. Under the terms of the original contract it was expressly stipulated that Mr. Hale should not be required to engage in the elevator business. It contemplated his retirement from the field, save such advice, aid, influence and assistance as he might render the Hale Company "without being actually engaged in the business." It was never the agreement of the parties that Hale, upon the request of appellant, should be required to go into the business world and solicit contracts for appellant. To quote from appellant: "When these contracts were made, in 1888, William E. Hale was at the zenith of his business career, * * * a career which had attracted wide and general attention in business circles, not only in Chicago, but in the north-west. As an elevator man he was the peer, if not the superior, of any elevator man in Chicago. At that time the Hale elevator stood second to none in the estimation of architects, contractors, builders and owners. The greatest asset that he then possessed was his personality,—the good will of his business. * * * William E. Hale had acquired his elevator fame by reason of his wonderful ability and skill in securing contracts for the construction of elevators."

From the contract of 1888 we think it clear that the parties contemplated the retirement of Hale from the elevator business, and that it was the purpose of the Crane Company to remove so successful a rival from further competition, and acquire for itself the name and good will that Hale had spent many years in attaining. The intention is nowhere expressed in the contract that this "wonderful skill and ability in securing contracts for the construction of elevators," possessed by Hale,

was to be transferred to appellant, and that the Hale Company was to be entitled to call upon W. E. Hale to solicit contracts for it, but, on the contrary, he was to render only such aid and assistance as he might be able "without being actually engaged in the business."

When the contracts for supplying the Marquette and Champlain buildings with elevators came upon the market, Coen, as business manager of appellant, discovered that these contracts could not be secured by appellant without the active assistance of Mr. Hale, and it is perfectly apparent that Coen understood that by the agreement sued upon he was employing Mr. Hale, as a skillful salesman, to again actually and actively engage in the elevator business in the interest of appellant. It is evident the terms of the former contract were not broad enough to cover the services expected of and actually performed by Hale in securing these elevator contracts. There is evidence tending to show they were let to the Hale Company by reason of the confidence the constructor of the buildings had in Mr. Hale, and each contract with the constructor of the buildings provided that Mr. Hale should superintend the work to completion, and thus compelled him to again actually engage in the business during the time occupied in the construction of the elevators, and the Fuller Company, the constructor of the Marquette building, wrote appellant: "Please prepare necessary drawings and secure Mr. Hale's approval, and file them in our office before execution of the work. We intend to hold Mr. Hale personally responsible for the work, and request you to intrust him with all business connected with this matter, so that he may be conversant with the work and responsible for its execution. This will put us in a position to be sure of his constant attention to the details of the work." This agreement entered into between Hale and appellant, through Coen, requiring Hale to go out and actively engage in procuring these contracts, was not inconsistent with the contract of 1888

and was not in fraud thereof. This being true, it is immaterial whether or not Hale informed Coen of the contract of 1888 when the arrangement providing for the sale of elevators was made, and the question of Coen's authority to change the former contract (1888) under seal, made by his company, does not arise.

It is next contended that Hale is guilty of fraudulent deceit upon appellee's manager, Coen, in obtaining the reduction of the price at which appellant would furnish the respective elevators. It will be remembered that when this trial was had William E. Hale was dead and his testimony had not been taken, and what appears in relation to that question is from the various exhibits in the record and the testimony of Charles N. Coen, appellant's general manager. Upon this question the record discloses that when it became known that the Fuller Company, which was constructing these buildings, was ready to figure on elevators, manager Coen approached William E. Hale, who was in the appellant's office consulting the head of the draughting department, who was making some plans for him on a private work of his own. Coen asked him if he would help with these contracts, and Hale asked him what consideration there would be in it for him. Coen suggested five per cent commission. Hale said: "No; you fix the price you will sell the elevators for, and anything I get over that will be mine, provided you buy the material of the elevator plant in the Transportation building, at the World's Fair, put in by the Vertical Transit Company." Coen says: "I agreed to that. I told him to draft a document and I would sign it, and did sign it as general manager of the Hale Elevator Company. We spoke at that time of the New York Life, the Marquette and the Champlain buildings, which were under process of erection at that time. Three passenger elevators, and possibly a fourth, and two lift-hoists, were required for the Champlain building; eleven passenger and one freight for the Marquette building."

This conversation was on October 19, 1893, and the contract then made is set out in the statement as of that date. Witness further testified that on November 25 Hale asked him to reduce the price on account of competition he was having with an outside elevator company, as he did not think he could secure it at appellant's price, and that at that time Coen took the letter containing the statement of prices which appellant would require, and wrote opposite the figures $25,000, being the price formerly proposed for the elevators for the Champlain building, the figures $23,000, and at the same time wrote and delivered to William E. Hale a letter, which contained the following clause: "We will execute said contracts, when secured by you, at the prices and upon the terms set forth in our letter to you dated October 19, 1893, such prices to be hereafter modified as we may mutually agree, but otherwise to remain as stated in said letter. Upon the execution of the contract with the George A. Fuller Company for the elevator plant in the Champlain building, we hereby agree to purchase of the Vertical Transit Company the entire plant, except cars and enclosures, in the Transportation building, at Jackson Park, and to take immediate possession of the same, and to remove it to the satisfaction of the World's Columbian Exposition." Then, after stating how appellant would pay for the transit elevator company's plant, he concludes the letter: "If you shall close a contract for us for the Marquette building elevator plant, we will pay for the elevators at Jackson Park the additional sum of $1500." And on the same day, and at the same time, W. E. Hale, for himself and the transit company, wrote and delivered to Coen, as general manager of appellant, a letter accepting the propositions contained in the last named letter.

This same witness testifies that on the 25th day of November,—the day that these writings above referred to were drawn,—William E. Hale brought to him a contract with the Fuller Company for the Champlain build-

ing, which was in the nature of a proposition from the appellant to the Fuller Company, which contained the statement: "We propose to furnish necessary material and erect and put in place four passenger elevators and two sidewalk hoists in Champlain building in accordance with specifications by Holabird & Roche, architects, revised to date, and complete the same in time required by you, for $27,300.    *    *    *    We also agree to add another passenger elevator, in accordance with said specifications, any time within two years from date for $4500." This witness testifies that this proposition was handed to him on the morning of the same day that he wrote the letter of November 25 to William E. Hale, and made the change in his contract with Hale from $25,000 to $23,000 to be paid for the elevators; that when this proposition was presented to him it was not signed by anybody; that he made it in duplicate, and signed one copy and sent it to the Fuller Company and retained the other copy. He further says: "At the time I signed those papers [meaning the letter to Hale and the change in the specifications] I knew he was selling the elevators for $27,300, and the same day I gave him the letter with the modification and the reduction to $23,000. When we got the contract back I filed it with the credit man, and from there it went to the books, and then into my hands for construction." The same witness testified that on December 29 Mr. Hale came to his office and told him that the Standard Elevator Company was figuring on the Marquette building job, and that its figures were $48,000; that he didn't believe he could get more than $55,000 for the Hale Elevator Company for the same job. Witness further said that Hale told him that he did not believe he could get the contract for $60,000, and asked him if he would scale it down; that he then did take the letter of October 19 and changed the scale as to the Marquette building from $60,000 to $55,000. Witness further says that in this same conversation Hale called his atten-

tion to the fact that the architects were in dispute with the Crane Elevator Company about some business matters and would not do it a favor or strain a point in its favor, and that the Marquette and Champlain people knew that the two companies were owned by the Cranes; that Mr. Aldis, who represented the Marquette people, thought very highly of the vertical transit elevator plant, and that the architect did also; thought they were a little better than the ordinary run of elevators. He states that this conversation was in the forenoon, and that in the afternoon he received from Mr. Hale, signed by the Fuller Company, the proposition for the Marquette building. This proposition was in the form of a letter from appellant to the Fuller Company, and dated December 30, 1893, and was to furnish eleven passenger elevators and one freight elevator for $70,000, and contained a provision that "so much of the Otis vertical cylinder elevators, used in the Transportation building at World's Fair, as are available, be used in this plant." The witness said he then executed that contract in duplicate, but before doing so and when shown the contract, it appearing that $70,000 was the price, he said: "I expressed great surprise at the price he got, and told him he had got me into a serious difficulty; that he had expressed to me the opinion that $55,000 would be difficult to get, and that here, on the same day, he closed the contract for $70,000, and that I would have to explain to my employers how I allowed him to make $5000 reduction in my price, and I expressed great admiration for his business capacity in being able to do such a thing. He remarked about my objection, that business was business; that is his language, substantially; he was not doing work like that for nothing, and it was up to me; if I didn't want to sign it I didn't have to take it. Well, I signed it and took it." The witness further said that he could not refuse to sign it, because then he would have lost the contract; that he preferred to keep the contract

rather than revoke it, because, in his limited judgment, it was a good thing to have in the office; that as a business proposition he thought the contract a good thing for his company; that he told Mr. Hale that he had "kind of skinned him" on it, but that he would stand by it, and that he never at any time made any objection to going on with the work under either of the contracts. It appears from the evidence, also, that every letter or paper that Coen, the appellant's general manager, signed, was made in duplicate, one copy being retained by Coen for his company and the other delivered to the other party.

On November 25, 1893, the day the contract was made for supplying the Champlain building, appellant, by its manager, Coen, forwarded to the Fuller Company specifications for the work in the Champlain building, and pursuant to the letter, proposal and the specifications, a formal building contract, bearing date November 25, 1893, was also entered into and signed by the Hale Elevator Company, by Coen, its general manager, and the Fuller Company. In the written proposal from appellant to the Fuller Company, and in the specifications relating to the plants for both of these buildings, it is expressly stated that all work shall be under the supervision and to the approval of W. E. Hale.

Appellant, however, claims that all these transactions between Coen and William E. Hale were unknown to it, except in a general way; that it had no knowledge that he was to receive any stated compensation, nor did it know that he was to represent it, as superintendent, in the construction of the plant. In connection with that contention appears the significant fact that on October 23, 1893, appellant's manager, Coen, wrote W. E. Hale that he had been instructed to say that the Hale Elevator Company must not take the contract for the elevators in the New York Life building. The same authority that Hale had for making the contracts for the Champlain and Marquette buildings was contained in

the same instrument that gave him authority to contract for the New York Life building, and if Mr. Crane had such information four days after that first contract was made with Hale that called upon him to direct his general manager to write to Mr. Hale that the New York Life contract must not be taken, it is but a natural and reasonable inference that he got it from the contract itself, a copy of which was in the possession of his company. The evidence also shows that before any contract was made with W. E. Hale by Coen, as general manager, he did talk with W. H. Coen, vice-president of the appellant company, in regard to the employment of Mr. Hale in this very transaction.

It will be observed that W. E. Hale was not to execute or make contracts for appellant for the elevators in question, but that he was to do the negotiating or fixing the terms upon which the contracts were to be, and were in fact, executed by appellant, through its general manager; that each of the contracts that were entered into was first formally put in shape by a written proposition emanating from appellant to the Fuller Company; that under the terms of his employment it was impossible for Hale to make a contract with the Fuller Company the terms of which and the price at which the plants were to be furnished should not be fully known by appellant before the execution of any contract. This is not the case of the agent, by misrepresentation, inducing the principal to reduce the price, and then following that arrangement by making the contract on its face appear at the reduced price, while in fact having a side agreement or secret understanding between himself and the party to whom he is making the sale, by which he shall reap additional benefit and reward. If it were, it would bear a very different appearance in all its aspects. In this case there is no evidence tending to show, nor is it even contended in argument, that Hale was to receive any compensation or reward from the Fuller Company

other than that which he did receive under the contracts executed by appellant, by virtue of the payments made from the Fuller Company to appellant for the plants contracted for. The law is so well settled that where the principal is possessed of a full knowledge of the terms of the contract and the benefit which his agent is to receive under it, and accepts and performs the contract, the principal is then held to waive or to be estopped to make any objection to it that could have been made without such knowledge, that it seems unnecessary to cite authorities.

With such facts appearing in the record as above mentioned, questions of fact covering and applying to many of the objections raised by the appellant arose that were proper for the consideration of the jury. Under them, it was a question of fact whether the appellant had been deceived by Hale, and had entered into these contracts without a full knowledge of all the facts and circumstances relating to them that were material for it to know, and in making the reductions complained of. We think, therefore, that the court did not err in refusing to direct a verdict for appellant.

Nor did the court err in giving appellee's second instruction, which told the jury that fraud was not to be presumed, but must be proved; that fraudulent representations or concealments, as a defense to a contract, must relate to facts material to the questions involved; must be relied upon by the parties to whom they are made and who are expected to act thereon, and the contract must be in fact made in reliance thereon, and that if, in procuring the contract sued on, or either or both the modifications thereof, Hale fraudulently concealed from Coen, appellant's manager, the existence of material facts or fraudulently made false statements of material facts, if Coen did not rely upon such representations or if his conduct in said matter was not influenced thereby, then the defense is not made out.

Nor was it error to give appellee's seventh instruction, which was, in effect, that the jury were the judges of the credibility of the witnesses and the weight of the testimony, and that in so judging they might consider to what extent witnesses were corroborated or contradicted by other evidence and circumstances proven in the case; the probability or improbability of the matters they testified to, when considered in connection with the other evidence; and that if the jury believed any circumstances proven in the case, relative to any issue, were of greater weight in determining that issue than the oral testimony of witnesses, they were at liberty so to decide. We think this instruction was especially applicable to the testimony of Coen, appellant's general manager, in connection with the many written exhibits introduced in evidence, executed by him, that tended at least to contradict his version of the transaction.

It is also insisted that it was error on the part of the court to have allowed the testimony to go to the jury showing the time spent and the attention given by Hale in the supervision of the construction of these elevators, and to show the time and manner of the various payments made for them. In support of this contention it is said that Hale was suing upon a contract, and that the questions of his time, and of payments after the signing of the contracts by the parties thereto, were not material to the issue. We are unable to adopt this view of the case. We think that it reasonably appears, from the evidence, that appellant knew that in order that Hale might get these contracts for it, it was obliged to contract that Hale should have the supervision of the work, and it fully appears that it did so contract. There is evidence, also, tending to show that it was regarded as material, on the part of those with whom the contracts were made, that Hale should be especially attentive in this supervision, and that appellant had knowledge of the fact, also, by the contracts with Hale, that he was

to be paid as the work progressed,—half of his pay when the first payment was received by appellant, one-fourth when the second payment was received by appellant, and the balance when the contract was completed and accepted; and we think it was competent for appellee to show that Hale did supervise the work and that it was done according to the contract; that the various payments were made and that the work was accepted; and in addition to that, it tended to explain to the jury the conduct of appellant's agent in making the contract, and the changes in it, by which Hale was to receive a sum that is now contended by appellant was unreasonably large, and which it insists could only have been the result of fraud.

Appellant objects to the modification by the court of instructions 12 and 13 as offered by it. Instruction 13 told the jury that if W. E. Hale represented to Charles N. Coen that he could not secure the contract for the Marquette building for $60,000 or for more than $55,000, and that unless Coen would reduce the price to $50,000 that contract would be lost, and if such representations were false and known so to be by Hale, and that such representations were of the kind and character to mislead and deceive a person of ordinary prudence, and that said Coen did believe said representations to be true, and by reason thereof reduced the price of said elevator from $60,000 to $55,000, then appellee could not recover anything for the services of W. E. Hale. The twelfth was a like instruction, except that it related to the Champlain building. The court modified both of these instructions by striking out the word "anything" and inserting the words "the amount of the reduction so obtained." Appellant insists this was error, and that although the first contract may have been fairly entered into, yet if the modification of that contract was obtained by fraud, and although the contract was fully performed by W. E. Hale and the appellant received the benefit thereof,

still the alleged fraud practiced in procuring the large remuneration that Hale was to receive for his services vitiated the entire contract, and that appellant should be allowed to hold the $10,000 which it received over and above the first proposition of $60,000 for the plant in the Marquette building and the $2300 which it received in excess of its first proposition as to the Champlain building.

."Out of the facts the law arises," is an old and well known maxim. It is difficult to find a case exactly in point. Appellant has cited none, and appellee but one or two that bear any semblance to the case at bar. The exact question seems not to have been before this court before and is not wholly free from doubt. Lawson, in his work on Rights, Remedies and Practice, (Personal Relations,) chap. 10, sec. 95, says: "Where the agent complains to his principal that the terms of the contract are too onerous on him, and seeks to procure a modification rendering it more favorable to him, the utmost good faith is required of him in such negotiations, and upon any misrepresentations shown the courts will hold the modification void, and settle the accounts and dealings of the agency according to the original contract." In *Neilsen* v. *Bowman,* 29 Gratt. 732, a contract of agency had been made which, at the time, was valid. A much more favorable contract to the agent was afterwards made upon the fraudulent representations of the agent. The court held that in entering into the original contract the parties acted at arm's length and could deal as they saw fit, but that after the contract was made and the agency had begun a fiduciary relation existed between the parties, which required of the agent good faith and honesty in all further dealings in regard to it, but that the fraud as to the modification did not affect the original contract and that the accounts of the parties would be settled according to it. This view of the law seems to appeal to reason, and to lead up to the full measure of the rule that a party shall not benefit by his own wrong. While the-

consequences of the law as to the acts of parties are not matters with which the court is called upon to deal, yet when the court can see that to adopt a rule would work absolute injustice and wrong it will be slow to do so. We think the court did not err in modifying the instructions in the regard mentioned.

Complaint is made as to the giving and refusing of other instructions which we deem it unnecessary to discuss, as all that were given and are objected to have been covered by principles already discussed, and all that were refused and stated the law as applicable to the case were covered by instructions given.

It is further said, however, that the judgment should be reversed because the declaration is not sufficient to support it. As we understand it, appellant takes the view that from the amount of the judgment rendered the jury must have found that there was fraud in obtaining the modifications of the contract, and that the jury were therefore controlled in their verdict by the twelfth and thirteenth instructions as modified, and that such being the case, it is insisted there is no count in the declaration which covered the original contract, as all the counts are special, there being no common counts. We think the second count, which set out in *hæc verba* all the contracts as they were made and as the modifications took place, beginning with the written proposition of October 19, 1893, and the modifications thereon, and containing the letters of November 25 by proper averments, was sufficient, under our statute, to support the verdict. Besides, as to what instruction, if any, controlled the jury in reaching its verdict can be nothing more than a matter of conjecture, as there is no special finding.

Upon the whole case we think the judgment of the Appellate Court is right, and it is affirmed.

*Judgment affirmed.*